UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANTHONY ROSS,

                    Petitioner,                16 Civ. 9202 (PMH) (AEK)

      -against-                   **REPORT AND
                                          RECOMMENDATION**

TINA M. STANFORD,
*Chairwoman, New York Parole Board*,

                    Respondent.
-------------------------------------------------------------X

**TO: THE HONORABLE PHILIP M. HALPERN, U.S.D.J.[1]**

Currently before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Anthony Ross ("Petitioner"), challenging his judgment of conviction for the crimes of course of sexual conduct against a child in the second degree and endangering the welfare of a child.  ECF No. 1 ("Petition") ¶ 5.  Petitioner contends that habeas relief is warranted because his conviction "was based on a violation of his Sixth Amendment right to effective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), and the state court's rulings [affirming his conviction] were contrary to or involved unreasonable application of clearly established federal law."  Petition ¶ 12.

For the reasons that follow, I respectfully recommend that the Petition be DENIED.

---

[1] This matter originally was referred to the Honorable Lisa Margaret Smith by the Honorable Nelson S. Román.  ECF No. 5.  The case was reassigned from Judge Román to Your Honor on April 15, 2020, and on October 15, 2020, the referral was reassigned from Magistrate Judge Smith to the undersigned.

## BACKGROUND[2]

**I.      The Crimes at Issue, the Family Court Hearing, and the
         Initiation of Criminal Proceedings**

K.K. was born on July 6, 1999.  Resp. Aff. at 2.  At the time of K.K.'s birth, her mother, B.K., lived in Peekskill with Petitioner, K.K.'s biological father.  *Id.*  When K.K. was four weeks old, she and her mother moved out of Petitioner's apartment.  *Id.*  Petitioner had visitation rights starting when K.K. was approximately two years old—first supervised, then unsupervised.  *Id.*  When K.K. was four years old, Petitioner was permitted to have unsupervised visitation with her every other weekend, from Friday through Sunday, at his Peekskill apartment.  *Id.*  Beginning in September 2003, Petitioner's girlfriend Saori would sometimes stay over at the apartment with Petitioner and K.K.  *Id.*  On these weekends, K.K. slept in the bedroom and Petitioner and Saori slept in another room.  *Id.* at 3.

K.K. was five years old and in kindergarten from September 2004 through June 2005.  *Id.*  During this period, B.K. noticed that K.K. often would scream and cry when B.K. dropped her off for weekend visits with Petitioner, because she did not want to go with her father.  *Id.* at 4.  Eventually, B.K. arranged for her to receive counseling at the Women's Center in Mahopac; starting in April 2005, K.K. had one-on-one counseling sessions with a therapist at the Center.  *Id.*  On May 18, 2005, the therapist called B.K., and that same day B.K. took K.K. to the Advocacy Center at the Putnam County Department of Social Services.  *Id.*  Two caseworkers

---

[2] The following is a summary of facts relevant to Petitioner's state court conviction and associated post-conviction proceedings.  Additional facts are discussed elsewhere in this Report and Recommendation as needed for the disposition of Petitioner's claim.  Detailed recitations of facts are set forth at pages 2-14 of Respondent's Affirmation in Opposition to the Petition, *see* ECF No. 12 ("Resp. Aff."), and pages 3-40 of Petitioner's Memorandum of Law in Support of the Petition, *see* ECF No. 3 ("Pet. Mem.").

interviewed K.K. without B.K.; a Peekskill Police Officer, Pamela Sgroi, was also present during the interview. *Id.*

The next day, B.K. brought K.K. to the Children's Advocacy Center at the Westchester Institute for Human Development. *Id.* K.K. was examined by Dr. Jennifer Canter, the director of the Center. *Id.* One of the Putnam County Department of Social Services caseworkers had arranged for the examination because she was concerned, based on K.K.'s disclosures to her therapist, that K.K. was being sexually abused. *Id.* K.K. first spoke with Dr. Canter without B.K present, and told Dr. Canter that her father beat her and Saori, that he hit K.K. on her ankles with a belt, and that he touched her private parts with his fingers. *Id.* at 5. During the physical examination, Dr. Canter observed that there were small, faint bruises on K.K.'s ankles, which she concluded were consistent with K.K. having been hit more than once with a belt, and which appeared to have been no more than weeks old. *Id.* Dr. Canter then examined K.K.'s genitalia using a colposcope, and videotaped the examination; during this portion of the examination, Dr. Canter noticed that K.K. had an asymmetrical hymen. *Id.* Dr. Canter was able to compare the results of the May 19, 2005 examination to one she had performed on K.K. on October 29, 2002; she found that when she previously examined K.K., K.K.'s hymen was completely symmetrical. *Id.* at 6. Upon discovering this, Dr. Canter re-examined K.K. on June 1, 2005, this time with K.K. in a different position, and observed the same loss of hymenal tissue. *Id.*

A hearing was held in Putnam County Family Court in November 2005 pursuant to a petition from the Putnam County Department of Social Services alleging that Petitioner had sexually abused K.K. *Id.* Dr. Canter was one of the witnesses who testified at that hearing; Petitioner was represented at the hearing by his retained attorney, Matthew Mazzamurro. *Id.* at

3

6-7.  At the conclusion of the hearing, the court sustained the petition, finding that Petitioner had sexually abused K.K.  *Id.* at 7.

Thereafter, Petitioner was charged, by Westchester County indictment number 06-00124, with course of sexual conduct against a child in the first degree under N.Y. Penal Law § 130.75(1)(a), incest under N.Y. Penal Law § 255.25, assault in the third degree under N.Y. Penal Law § 120.00(1), and endangering the welfare of a child under N.Y. Penal Law § 260.10(1). Resp. Aff. at 14; *see* Resp. Ex. 1 (ECF No. 13-1).[3]  Petitioner was arraigned in Westchester County Court on April 7, 2006.  Resp. Aff. at 14.

## II.    Relevant Pre-Trial Proceedings and Trial

### A.    Pre-Trial Motions

On July 11, 2006, Judge Loehr of the Westchester County Court granted an application by Mr. Mazzamurro—made as part of an omnibus pretrial motion—to hire an investigator and

---

[3] All citations to "Resp. Ex. ___" refer to exhibits submitted to the Court by Respondent that comprise substantial portions the state court record from Petitioner's criminal case.  *See* ECF Nos. 13-1 through 13-41.  A list of Respondent's exhibits is included as part of Respondent's Memorandum of Law in Opposition to the Petition.  *See* ECF No. 13 ("Resp. Mem.") at i.

Various materials were provided to the Court by the parties via paper submissions, *see* ECF Nos. 9, 21, to protect the identity of the child victim in this case, in accordance with New York Civil Rights Law § 50-b.  To ensure that these materials were all properly included as part of the federal court record in this matter, the Court directed that all of these documents be formally docketed under seal and maintained in the Court's vault.  *See* ECF Nos. 24 through 36. The sealed filings consist primarily of transcripts of Petitioner's state court criminal proceedings—the trial transcript (ECF Nos. 25 through 31); transcripts of pre-trial proceedings on September 7, 2006 ("9/7/06 Tr."), September 14, 2006 ("9/14/06 Tr."), and November 2, 2006 (ECF No. 24); the transcript of a post-verdict proceeding on May 3, 2007 (ECF No. 32); the transcript of the sentencing (ECF No. 33); and the transcript of a post-judgment hearing pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 on June 7 and 10, 2011 ("440.10 Hr'g Tr.") (ECF No. 34).  The sealed filings also include certain exhibits that were submitted in state court in support of Petitioner's motion to vacate the judgment pursuant to C.P.L. § 440.10 (ECF No. 35), and an appendix to Petitioner's reply submissions in support of the C.P.L. § 440.10 motion (ECF No. 36).  *See* ECF No. 21 ¶¶ 2-3 (further describing these additional materials).

medical experts with public funds pursuant to County Law § 722-c.[4]  Resp. Aff. at 14; *see* Resp. Ex. 2 (ECF No. 13-2).

On September 7, 2006, Mr. Mazzamurro appeared before Judge Bellantoni of the Westchester County Court, seeking to be relieved as counsel for Petitioner.  Resp. Aff. at 15; *see* 9/7/06 Tr.  According to the court, the request had already been discussed on two prior occasions, principally because Petitioner lacked funds to pay Mr. Mazzamurro.  9/7/06 Tr. at 2.  The court also noted that while Mr. Mazzamurro represented Petitioner in Family Court, this would be his first felony trial.  *Id.*  Finally, the court explained that Mr. Mazzamurro had "been unable to avail [himself] of any expert assistance, whether it be in the form of expert evaluations or individuals."  *Id.* at 3.  Mr. Mazzamurro asked to be relieved because he felt he was "not in a position to provide the best representation for [Petitioner] at this time."  *Id.*  The court granted Mr. Mazzamurro's request, citing the fact that Petitioner "has no further funds to retain an attorney," and assigned Barry Warhit to represent Petitioner.  *Id.*  At the hearing, Mr. Warhit, who was present, reported that he had spoken with Petitioner both on the telephone and moments before in the courtroom, and that Petitioner had no objection to him being substituted for Mr. Mazzamurro.  *Id.* at 4-5.  Petitioner had left the courtroom after speaking with Mr. Warhit, but before both Mr. Warhit and Mr. Mazzamurro represented to the court that he consented to the substitution.  Resp. Aff. at 15.

---

[4] N.Y. County Law § 722-c provides that a judge shall authorize counsel, whether appointed or retained, to obtain investigative, expert, or other services on behalf of a defendant upon an *ex parte* finding that the defendant is financially unable to obtain them.  The version of the statute in effect at the time of Petitioner's criminal prosecution stated that a court may only provide for compensation in excess of $1,000 per investigative, expert, or other service provider "in extraordinary circumstances."  *Id.*  The current version of the statute allows for an award of up to $3,000.

At a subsequent appearance before the court on September 14, 2006, Petitioner claimed that in fact he had not consented to the substitution of Mr. Warhit for Mr. Mazzamurro, and that he wanted Mr. Mazzamurro to continue to represent him. 9/14/06 Tr. at 2. Mr. Mazzamurro affirmed that he wanted to proceed with representing Petitioner and that Petitioner wanted Mr. Mazzamurro to remain as his attorney; Petitioner confirmed that his counsel of choice was Mr. Mazzamurro. *Id.* at 4-5. Accordingly, the court relieved Mr. Warhit and allowed Mr. Mazzamurro to represent Petitioner, in accordance with Petitioner's expressed preference. *Id.* at 6. As part of this proceeding, the court remarked that "[a]pparently Mr. Ross does have the ability to afford an attorney such that even if [Mr. Mazzamurro] were relieved in the future he would have to retain another attorney rather than have the [c]ourt appoint one." *Id.* at 5. The court asked Petitioner if he understood this, and he confirmed that he did. *Id.*

## B.    Trial

At Petitioner's trial in December 2006, the then-seven year-old K.K. testified that Petitioner had repeatedly sexually abused her. Resp. Aff. at 8. Upon the application of the prosecution, and over the objection of defense counsel, the trial court permitted most of K.K.'s testimony to be conducted via closed circuit television. *Id.* at 8-9. On cross-examination, Mr. Mazzamurro elicited certain answers from K.K. that amounted to a recantation of significant aspects of her testimony, and on re-direct examination, K.K. vacillated as to whether Petitioner had touched her private parts with his private parts or with his hands. *Id.* at 8. Dr. Canter also testified for the prosecution at trial, offering her conclusion that K.K. had suffered an injury that was consistent with penetrating trauma to the hymen. *Id.* at 9. The videotapes of all three of Dr. Canter's examinations of K.K. were played for the jury, with Dr. Canter explaining her findings and pointing out where the loss of hymenal tissue could be seen. *Id.* at 10. During cross-

examination, Mr. Mazzamurro elicited from Dr. Canter that there were no bruises, lesions, hematomas, scars, or lacerations on the hymen, labia, or other parts of K.K.'s genitalia, and also that Dr. Canter had in the past learned that an abuse victim had provided her with inaccurate information. *Id.* Dr. Anne Meltzer, a child psychologist, testified for the prosecution as an expert in child sexual abuse, child psychology, and child development. *Id.* She testified in general terms about Child Sexual Abuse Accommodation Syndrome ("CSAAS"), which she described as a pattern of behavior explaining why child victims of sexual abuse often behave in a certain way, including with respect to delayed and conflicting disclosure, recantation, and the range of reactions that children have when testifying in court. *Id.* at 10-11. When cross-examined, Dr. Meltzer acknowledged that questions posed in a coercive manner have the potential to produce inaccurate answers, that children as young as K.K. could be impressionable, and that she had been involved in cases where it was ultimately determined that a child made false accusations. *Id.* at 12. She confirmed that in most of those false accusation cases, the parents of the child victim had been involved in custody or visitation disputes. *Id*.

Petitioner did not testify at trial. The defense presented four witnesses—Petitioner's then-fiancée Saori; Myrna M., a neighbor of Petitioner's; Marzel H., a friend of Petitioner's; and Raquel R., Petitioner's first cousin. *Id.* at 12-14. Each witness presented positive portrayals of Petitioner's relationship with K.K. and K.K.'s demeanor in their presence, and none indicated ever having seen or heard anything of concern between Petitioner and K.K. *Id.*

On December 15, 2006, a jury found Petitioner guilty of the crimes of course of sexual conduct against a child in the first degree, incest, assault in the third degree, and endangering the welfare of a child. *Id.* at 16.

III.    **Motion to Set Aside the Verdict**

On April 2, 2007, prior to sentencing, Petitioner—now represented by a different retained counsel, Neal D. Futerfas—moved to set aside the verdict pursuant to C.P.L. § 330.30(1), claiming that Mr. Mazzamurro had failed to provide him with effective assistance of counsel. *See* Resp. Ex. 3 (ECF Nos. 13-3 through 13-7). Among other things, Petitioner asserted that Mr. Mazzamurro failed to request a hearing regarding the prospective testimony of Dr. Meltzer or Dr. Canter; failed to call a defense expert at trial; failed to review expert literature on CSAAS or sex abuse medical issues; and failed to consult with experts in those fields. *See id.* ¶¶ 30-32, 36-41, 251-67, 270-96. Included as part of this motion was a 10-page affidavit from Mr. Mazzamurro himself in support of Petitioner's request for a new trial; the affidavit attested to various alleged errors in connection with the trial, including his purported failures to consult with experts, comprehensively cross-examine B.K, and sufficiently cross-examine K.K. *See id.* at Ex. A (ECF No. 13-6).

Judge Bellantoni denied this motion on May 30, 2007. *See* Resp. Ex. 6 (ECF No. 13-10). After noting that "[a] motion to set aside the verdict is not the appropriate motion by which to raise ineffective assistance of counsel claims," *id.* at 3, the court nevertheless addressed the merits of the motion, even though "all the reasons stated [in the motion] revolve around [Petitioner's] perceived deficiencies of trial counsel," *id.* at 4. While the court described Mr. Mazzamurro's affidavit as "disturbing," the judge also described it as "a clever strategy," buttressed by post-trial "hindsight" offered after counsel availed himself of the opportunity to speak with the trial jurors after the verdict. *Id.* at 5. Judge Bellantoni found that any "'deficiencies' were a result of trial strategy or other legitimate explanation—for example, [Petitioner's] alleged lack of funds to consult with an expert," and explained that "[t]he fact that

8

trial counsel may have pursued another trial strategy [] does not imply that the trial strategy actually pursued at [Petitioner's] trial constituted ineffective assistance of counsel." *Id.* The court noted that Mr. Mazzamurro was "always prepared during conferences, made proper objections, called several witnesses on [Petitioner's] behalf and cross-examined People's witnesses effectively." *Id.* at 6. Ultimately, the court ruled that "[w]hen viewed in the totality of the representation provided by trial counsel . . . Mr. Mazzamurro provided meaningful representation as guaranteed by the Federal and New York State Constitutions." *Id.* The court found that all other grounds raised by Petitioner to set aside the verdict were without merit. *Id.*

Petitioner was sentenced on June 18, 2007 to an aggregate prison term of 20 years, and subsequently filed a timely notice of appeal from the judgment of conviction. Resp. Aff. at 17.

**IV.    Motion to Vacate the Judgment Pursuant to C.P.L. § 440.10**

**A.    The Parties' Submissions and the April 2011 Decision**

On June 15, 2010—nearly three years after the sentencing—Petitioner, still represented by Mr. Futerfas, filed a motion to vacate the judgment of conviction pursuant C.P.L. § 440.10, raising multiple arguments for why he received ineffective assistance of trial counsel. *See* Resp. Ex. 7 (ECF Nos. 13-11 through 13-17). Attached to this motion were the affidavit previously submitted by Mr. Mazzamurro in support of Petitioner's § 330.30 motion, as well as affidavits from Petitioner and two new defense experts, Dr. Lawrence Ricci and Dr. Maggie Bruck. *See* ECF No. 13-16 at ECF pp. 15-40 and ECF No. 13-17. Dr. Ricci, a Maine-based physician specializing in child abuse cases, reviewed Dr. Canter's testimony, and opined that Dr. Canter's conclusions as to the medical findings being "highly significant for penetrating trauma" were not supported by the evidence and could not be corroborated. ECF No. 13-16 at ECF pp. 29-30. In addition, Dr. Ricci concluded that the bruising on K.K.'s ankles "was so nonspecific and so faint

as to have no diagnostic utility in determining whether [K.K.] was physically abused by her father or, indeed, even hit with a belt." *Id.* at ECF p. 29. Dr. Bruck, who was, at the time, a professor in the Department of Psychiatry and Behavioral Science at Johns Hopkins University, concluded that Dr. Meltzer's testimony regarding CSAAS and "coaching" was "not supported by the current scientific literature," and that the defense "should have called an expert witness who could have easily refuted her testimony and provided the court with a scientific framework to evaluate the facts of the case." ECF No. 13-17 at ECF pp. 3, 5-6.

In its opposition to Petitioner's 440.10 motion, the prosecution took issue with the attempt to criticize, "through the lens of retrospective second-guessing," what it characterized as "reasonable" and "sound" strategic decisions by Petitioner's privately chosen and retained trial counsel "to use cross-examination as the primary means of diffusing the People's experts." Resp. Ex. 8 (ECF No. 13-18) at 19. The prosecution contended that the opinions of Petitioner's newly proffered experts did not refute the trial testimony of Dr. Canter and Dr. Meltzer or demonstrate that their testimony was objectively erroneous—instead, these experts "merely provide[d] different opinions." *Id.* In addition, the prosecution highlighted the fact that Mr. Mazzamurro contacted other doctors and conducted his own research concerning the medical evidence. *Id.* at 23-24. Further, the People noted that Mr. Mazzamurro skillfully and tactfully cross-examined K.K., which resulted in her recanting her direct testimony regarding penile penetration. *Id.* at 23.

On April 12, 2011, Judge Colangelo of the Westchester County Court denied Petitioner's § 440.10 motion with respect to the "vast majority of the alleged errors of Mazzamurro," finding that they fell "into the category of arguably reasonable trial strategy and tactics gone awry."

Resp. Ex. 10 (ECF No. 13-21) at 7.[5]  The court did, however, order "a hearing to examine the manner in which Mazzamurro addressed the issue of medical and trial expert witnesses, before and during the trial," citing other sexual abuse cases where the alleged failure by counsel to consult with or call a medical expert was indicative of ineffective assistance of counsel "particularly where, as here, the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." *Id.* at 12 (quotation marks omitted).  The court ordered that the hearing be "limited in scope to the issue of trial counsel's conduct with respect to medical experts." *Id.* at 13.

### B.    The Hearing

A hearing was held on June 7 and June 10, 2011, and Mr. Mazzamurro was the only witness who testified.[6]  Mr. Mazzamurro testified that he had been a practicing attorney for

---

[5] Petitioner's counsel in this habeas proceeding initially provided the Court with case citations to the County Court's April 12, 2011 decision and the County Court's second decision regarding the 440.10 motion, issued on November 30, 2011, in a letter that was filed under seal at ECF No. 6.  Respondent provided the actual decisions issued by the County Court as part of the state court record—they are docketed as ECF No. 13-21 (Resp. Ex. 10) and ECF No. 13-24 (Resp. Ex. 13).

[6] Prior to the hearing, the People asked to examine Mr. Mazzamurro's case files, in particular to review "any materials in the files bearing on financial restraints brought to bear on trial counsel's ability to represent Petitioner, specifically concerning counsel's ability to spend money on experts . . . ."  Resp. Aff. at 19; *see* Pet. Mem. at 30.  Petitioner asserted that the files were protected by the attorney-client privilege. *See id.*  The court agreed to conduct an *in camera* review of the files following direct examination of Mr. Mazzamurro, and determined that it would rule, on a question-by-question basis during cross examination, whether the privilege would be waived.  Resp. Aff. at 19-20; Pet. Mem. at 31.

The court examined two sets of case files *in camera*—a set of files that Mr. Mazzamurro had turned over to Mr. Futerfas after the trial, and a second set that he brought with him to the hearing that had been stored in his basement. *See* Resp. Aff. at 23 n.5; Pet. Mem. at 31 n.3. After the court reviewed Mr. Mazzamurro's files *in camera*, it provided a number of documents to the People.  Resp. Aff. at 22; Pet. Mem. at 31-32.

11

seven years prior to representing Petitioner in this case, but that Petitioner's case was his first felony trial and sex abuse trial.  440.10 Hr'g Tr. at 16, 18.  Petitioner first met and retained Mr. Mazzamurro in 2005 in connection with the Putnam County Family Court matter involving the same allegations of sexual abuse underlying his criminal case.  *Id.* at 20.  At that proceeding, Mr. Mazzamurro cross-examined Dr. Canter about her medical findings; prior to her testimony, Mr. Mazzamurro reviewed Dr. Canter's reports detailing her examination of K.K., her curriculum vitae, and her qualifications, and was aware that she had testified as an expert in both family and criminal court before.  *Id.* at 32-33, 144-47.

Mr. Mazzamurro was retained when Petitioner was indicted in the criminal case.  He testified that he recalled Dr. Canter's testimony in Family Court, understood that her testimony was harmful to his client, and believed he needed to obtain his own expert to counter the prosecution's expert testimony.  *Id.* at 146-47, 158.  Mr. Mazzamurro decided to contact medical experts after receiving a letter from the Westchester County District Attorney's Office on July 7, 2006, informing him that he would not receive copies of the colposcopy[7] videos, and would have to view them at the District Attorney's Office.  *Id.* at 162-63.  Mr. Mazzamurro testified, however, that he never had an expert review those video recordings, and never viewed them himself.  *Id.* at 41.  On July 11, 2006, the court granted Mr. Mazzamurro's request for funds for an investigator and expert witnesses.  *Id*. at 166; Resp. Aff. at 24; Pet. Mem. at 40.  Mr. Mazzamurro hired an investigator, Ellen Shapiro, to investigate B.K. and B.K.'s boyfriend, using

---

[7] A colposcopy is a diagnostic procedure that "involves using a specialized instrument known as a colposcope to examine the cervix, vagina, and vulva closely."  National Library of Medicine, "Colposcopy," *available at* https://www.ncbi.nlm.nih.gov/books/NBK564514/ [https://perma.cc/UM2Z-DSAP] (last visited Dec. 19, 2025).

a combination of the court-awarded funds and funds provided by Petitioner.  440.10 Hr'g Tr. at 49, 117-18, 172.

Mr. Mazzamurro testified that prior to the trial, he contacted a number of experts.  *Id.* at 29-30, 114.  Mr. Mazzamurro contacted Technical Advisory Services for Attorneys ("TASA"), an expert witness referral service, to find experts to review the video recordings of Dr. Canter's colposcopy examinations, and on the subject of CSAAS.  *Id.* at 28, 42-43.  Mr. Mazzamurro could not recall any specific conversations with experts over the telephone, and testified that these calls may have been made by someone in his office and not him personally.  *Id.* at 29, 47-48.  Mr. Mazzamurro or his office contacted several forensic psychiatrists, including Drs. Rosenberg and Welner, and Mr. Mazzamurro also believed he contacted Drs. Greco and Bruetner, whose names he had written on documents in his file.  *Id.* at 29-30.  Mr. Mazzamurro also testified that he might have contacted Beth Reiman of the Children's Advocacy Center, as her name was also in his file.  *Id.* at 160.  To the extent that there were conversations with experts, they covered the nature of the case and issues involved, and how much the experts would charge for their services.  *Id.* at 48-49.  In general, the experts charged between $3,000 and $5,000, although that number may have only covered the cost of the consultation.  *Id.* at 80, 113-14.

Mr. Mazzamurro also contacted K.K.'s pediatrician, Dr. Melvin Schaff.  *Id.* at 68.  Mr. Mazzamurro initially planned to call Dr. Schaff as a trial witness, and Dr. Schaff came to court to testify for the defense; he was prepared to testify that he had treated K.K., found her to be "a happy, healthy child," and did not observe any signs of abuse.  *Id.*  Ultimately Mr. Mazzamurro chose not to call Dr. Schaff as a witness, at least in part because Dr. Schaff could not assist in analyzing the colposcopy evidence.  *Id.* at 67-68.

13

Mr. Mazzamurro testified that on September 7, 2006, he asked to be relieved as Petitioner's counsel, on the ground that Petitioner could not pay his fee or for experts. *Id.* at 110, 174. Mr. Mazzamurro testified that he believed, and told Petitioner at the time, that it was necessary to hire defense experts, and Petitioner's lack of funds to pay for them was the principal reason he was asking to be relieved. *Id.* at 77, 111. The court granted Mr. Mazzamurro's application and appointed Mr. Warhit; Mr. Mazzamurro told Mr. Warhit that he sought to be relieved because Petitioner did not have the money to retain experts. *Id.* at 130. Mr. Warhit did not believe that experts were necessary. *Id.* at 149-50.

Mr. Mazzamurro testified that when he was relieved, Petitioner "begged and pleaded" to have Mr. Mazzamurro continue as his counsel. *Id.* at 111, 113. Mr. Mazzamurro testified that based on Petitioner's assurance that he had family financial assistance and would obtain the necessary funds to hire an expert, Mr. Mazzamurro agreed to return as Petitioner's retained counsel. *Id.* at 78, 113. Petitioner was unable to obtain these funds, however, and Mr. Mazzamurro ultimately concluded that he would need to seek an alternative strategy for Petitioner's defense that was not reliant on expert testimony. *Id.* at 117.

Mr. Mazzamurro testified that he performed Internet searches on the issue of CSAAS prior to the trial, and believed that he performed research on colposcopy examinations, but could not recall specifics and did not have copies of his research. *Id.* at 179. Mr. Mazzamurro testified that he reviewed an article entitled "Imperforate Hymen: Congenital or Acquired from Sexual Abuse?" published in *Pediatrics*, the official journal of the American Academy of Pediatrics; a general article on "The Female Hymen"; and an article entitled "Signs of Sexual Abuse Hard to Read." *Id.* at 72-74, 131-32. Mr. Mazzamurro had underlined portions of the last article, including these quotes from Dr. Abbey Berenson: "[t]here are some changes that occur in

14

hymenal features as a result of normal aging and development"; "[i]t's been demonstrated the physical exam is rarely a determining factor of whether somebody goes to jail"; and "[t]he child's history, confessions, the child's version of what happened are stronger determinants than the physical exam." *Id.* at 131-34. At the end of that same article, Dr. Vivian Everett, a member of the American Academy of Pediatrics, stated that although Dr. Berenson's findings "mesh with the Academy's guidelines for physicians in examining children suspected of being abused," "in some cases a mound or a notch would be cause for concern." Resp. Aff. at 28. Dr. Everett also noted that "[t]his is an evolving field, and more and more research needs to be done." *Id.* Mr. Mazzamurro testified that this article informed his strategy in the case, and recalled conducting Internet research on whether Dr. Canter's physical findings could have resulted from "simple growth by the child." *Id.*; *see* Pet. Mem. at 38; 440.10 Hr'g Tr. at 41. Mr. Mazzamurro also testified that he spoke to other attorneys, seeking advice and discussing strategy. 440.10 Hr'g Tr. at 131.

Mr. Mazzamurro testified that in an effort to counteract Dr. Canter's testimony at trial, his "strategy was to show that the child who made the allegation was incorrect, it didn't occur." *Id.* at 44. Mr. Mazzamurro highlighted the fact that on cross-examination, K.K. stated that she did not see her father's private parts, and that his private parts never touched her, a fact the child confirmed on re-direct examination. *Id.* at 75, 91.

During consultations with Mr. Mazzamurro, Petitioner told Mr. Mazzamurro that he was not guilty, and Mr. Mazzamurro believed him. *Id.* at 59.

### C.   The November 2011 Post-Hearing Decision

On November 30, 2011, Judge Colangelo denied the remainder of Petitioner's C.P.L. § 440.10 motion. Resp. Ex. 13 (ECF No. 13-24). The court noted that the June 2011 hearing was

"limited to examining the issue of trial counsel's conduct with respect to medical experts, with an eye toward evaluating the manner in which Mazzamurro approached the issue of medical experts and the rationale behind such approach in order to determine whether [Petitioner] had been afforded meaningful representation." *Id.* at 4.  The court found that Mr. Mazzamurro's approach to and efforts directed at medical expert testimony, "[w]hile not legion, . . . cannot be accurately described as insubstantial," and "took place against a backdrop of what [Petitioner] could or could not afford to do financially as communicated to and understood by Mazzamurro." *Id.* at 4-5.  The court described how, in light of Petitioner's financial constraints, and his insistence on proceeding with Mr. Mazzamurro as his attorney, Petitioner and Mr. Mazzamurro "had no alternative but to pursue a trial strategy focused on denial—denial that [Petitioner] had committed the acts alleged—rather than to demonstrate through their own medical expert testimony the unlikelihood that any untoward injury to the child had occurred, whether at the hands of [Petitioner] or someone else." *Id.* at 7.[8]

The court concluded that Mr. Mazzamurro's cross-examination of K.K. "cannot be described as ineffective," as it elicited a recantation regarding "her direct testimony of sexual penetration by her father"—an essential element of the top count of the indictment—and "at least called into question whether any abuse had occurred at the hands of [Petitioner]." *Id.* at 8.  In addition, although the court noted that Mr. Mazzamurro's cross-examinations of Drs. Canter and

---

[8] Notably, the court observed that Petitioner could not "without consequence, insist on a specific private counsel when an experienced assigned attorney was available, claim the ability then the inability to pay for medical experts and later claim that the decision to forgo calling such expert witnesses was flawed, while at once asserting a privilege that effectively prohibits Counsel from fully explaining the strategic choices made, as well as inhibiting the [c]ourt's ability to fully consider the rationale, or lack thereof, underlying such choices."  Resp. Ex. 13 at 11; *see also id.* at 12-16 (discussing the history of the attorney-client relationship between Petitioner and Mr. Mazzamurro and the court's inferences regarding trial strategies).

Meltzer "would likely have benefitted from a preparation enhanced by consultation with defense experts," it found that Mr. Mazzamurro took steps to prepare for the cross-examination of each within his financial constraints by reviewing medical literature, performing online research, asking questions of K.K.'s pediatrician, and referring to previous experience observing Dr. Canter in Family Court. *Id.* Mr. Mazzamurro also elicited some favorable testimony during expert cross-examinations, including Dr. Canter's inability to specify what, if anything, had penetrated K.K., and Dr. Meltzer's concession that her conclusions were less reliable in a situation where the child victim's parents are engaged in a custody dispute. *Id.* at 8-9.

The court ultimately concluded that Petitioner "was afforded meaningful and effective assistance under the applicable state and federal standards," *id.* at 16, including "with respect to the manner in which Counsel dealt with medical experts and testimony," *id.* at 18. The court held that as long as a defense attorney's decision not to call medical expert witnesses "was part of a coherent and reasonable defense strategy diligently pursued, the court will not second guess counsel's decision. This is particularly true when such strategy was instigated by defendant as his own decision and at his direction." *Id.* at 22. The court determined that "Counsel's conduct with respect to medical experts, while not perfect, was well within the parameters of meaningful representation," as he prepared as well as he could to meet the direct testimony of the prosecution's medical experts, reviewed the medical literature, and drew on past experience observing Dr. Canter. *Id.* Moreover, the court opined that "the strictures under which defense Counsel was operating as far as medical experts were concerned were not of his own making or choosing." *Id.* at 23. The court also found that Mr. Mazzamurro's decision not to apply a second time for public funds from the trial judge was both consistent with his trial strategy and a reasonable choice in light of Petitioner's previous representation to the court that he would

17

obtain the necessary funds to pay for his own defense. *Id.* at 25-26. Overall, the court concluded that Petitioner "failed to adduce sufficient facts [to] sustain his burden of proving, by a preponderance of the evidence, that this approach was not part and parcel of a reasonable defense strategy—a strategy which he either approved or necessitated by his own choices." *Id.* at 27.

**V.      Petitioner's Direct Appeal and Appeal of the Denial of the § 440.10 Motion**

On March 15, 2012, Petitioner perfected the direct appeal of his judgment of conviction, and raised 11 issues. *See* Resp. Ex. 14 (ECF Nos. 13-25 through 13-28). First, he asserted that he was denied effective assistance of counsel. *See id.* at 57-91. Second, he claimed that the trial court erred and abused its discretion, and that he was deprived of due process of law, when the court declared K.K. to be a vulnerable witness and permitted her to testify via closed-circuit television. *See id*. at 91-98. Third, he asserted that the trial court erred and abused its discretion, and that he was deprived of due process of law, when the court permitted reference to the medical examination Dr. Canter performed on K.K. in 2002. *See id.* at 99-102. Fourth, he asserted that the trial court erred and abused its discretion, and that he was deprived of due process of law, when the court permitted the prosecution under *People v. Sandoval*, 34 N.Y.2d 371 (1974), to cross-examine Petitioner, were he to testify, as to the existence of a prior conviction and the underlying facts of that conviction. *See id.* at 102-05. Fifth, Petitioner claimed that the trial court erred, and that he was deprived of due process of law, because the court allowed expert testimony about CSAAS. *See id.* at 105-11. Sixth, Petitioner asserted he was deprived of due process of law because the evidence was insufficient to support his conviction, and the verdict was against the weight of the evidence. *See id.* at 111-15. Seventh, Petitioner asserted that the trial court took actions that deprived him of the assistance of counsel, prejudiced the jury, and deprived him of a fair trial. *See id.* at 115-23. Eighth, Petitioner

18

claimed that he was deprived of due process of law because the prosecutor made improper comments during the direct examination of K.K. and during summation. *See id.* at 124-28. Ninth, Petitioner claimed that the trial court erred and abused its discretion, and that he was deprived of due process of law, because of its improper jury instructions. *See id.* at 128-29. Tenth, Petitioner claimed that the cumulative effect of all the above errors deprived him of a fair trial. *See id.* at 129-31. Finally, Petitioner asserted that he was deprived of due process of law because the sentence imposed on him by the trial court was harsh and excessive. *See id.* at 131-33.

On September 13, 2010, the Appellate Division, Second Department granted Petitioner's application for leave to appeal from the April 12, 2011 order denying his 440.10 motion in part and directing that a hearing be held, and the November 30, 2011 order denying the balance of the motion after the hearing. Resp. Aff. at 32. Petitioner filed his brief in support of this appeal on June 27, 2013. *See* Resp. Ex. 17 (ECF Nos. 13-31 through 13-34). In this appeal, Petitioner raised two issues. First, Petitioner asserted that the hearing court's April 12, 2011 decision erroneously dismissed almost all of Petitioner's claims of ineffective assistance as "arguably reasonable trial strategy and tactics gone awry" without properly setting forth the reasons for its determination. *See id.* at 75-94. Second, Petitioner asserted that the hearing court erred in its November 30, 2011 decision by finding that Petitioner had not met his burden of demonstrating ineffective assistance of trial counsel with respect to experts. *See id.* at 95-115.

The Appellate Division, Second Department decided both appeals on July 30, 2014. The appellate court affirmed the April 12 and November 30, 2011 decisions on Petitioner's § 440.10 motion, finding that "[b]ased on the totality of the circumstances, the County Court properly found that there were legitimate reasons that trial counsel did not present expert testimony, and

19

instead, challenged the People's evidence through cross-examination." *People v. Ross*, 119 A.D.3d 964, 965 (N.Y. App. Div. 2014).  Additionally, the appellate court held that "contrary to [Petitioner's] remaining contentions, viewing trial counsel's performance in totality, he provided meaningful representation." *Id.*  Specifically, the appellate court highlighted how Mr. Mazzamurro dealt with Petitioner's choice to keep him as retained counsel and Petitioner's lack of sufficient funds for experts by "pursu[ing] a strategy that focused on the denial of the accusations and impeachment of witnesses." *Id.*  The appellate court found that Mr. Mazzamurro conducted an effective cross-examination of K.K., getting her "to recant critical aspects of her testimony regarding genital contact between herself and [Petitioner], a necessary element of the charges of course of sexual conduct against a child in the first degree and incest."[9] *Id.*  The appellate court found that in his cross-examination of Dr. Canter, Mr. Mazzamurro successfully elicited an admission that "she could not determine whether an alleged asymmetry in the border of [K.K.'s] hymen was caused by penile penetration or was the result of one or more acts of penetration, which was a necessary element of the charge of course of sexual conduct against a child in the first degree." *Id.*  The appellate court also found that Mr. Mazzamurro elicited several unfavorable admissions from Dr. Meltzer, including that she mostly testified on behalf of the prosecution, that child sexual abuse allegations are unreliable when made in response to suggestive questioning, and "that this most often occurs, as here, against the background of a dispute over custody and visitation." *Id.*

The Appellate Division, Second Department issued a separate order on Petitioner's direct appeal from his judgment of conviction.  *People v. Ross*, 119 A.D.3d 961 (N.Y. App. Div. 2014).

---

[9] As set forth in greater detail below, these findings were central to the appellate court's decision on Petitioner's direct appeal, where these counts of Petitioner's conviction were, respectively, reduced and vacated based on the evidence in the trial record.

20

The appellate court ordered that the judgement be modified by (1) reducing the conviction of course of sexual conduct against a child in the first degree to course of sexual conduct against a child in the second degree; and (2) vacating the convictions of incest and assault in the third degree. *Id.* at 962. As modified, the court affirmed the judgment, and remitted the matter to Westchester County Court for resentencing as to the conviction of course of sexual conduct against a child in the second degree. *Id.*

With respect to the charges of course of sexual conduct against a child in the first degree and incest, the appellate court held that the evidence was not legally sufficient to establish Petitioner's guilt, as the evidence did not establish that Petitioner engaged in sexual intercourse with K.K. *Id.* at 963. The appellate court determined, however, that K.K.'s testimony that Petitioner "inserted his fingers into her vagina on more than one occasion during the designated time period . . . was legally and factually sufficient to establish Petitioner's guilt of course of sexual conduct against a child in the second degree." *Id.* The appellate court further found that "the evidence was legally insufficient to establish Petitioner's guilt of assault in the third degree, as the People failed to demonstrate that [K.K.] suffered substantial pain or physical impairment." *Id.* In addition, the appellate court explained that the contention, in the direct appeal, that Petitioner was deprived of the effective assistance of counsel was "based, in part, on matter appearing on the record and, in part, on matter outside the record, and, thus, constitutes a mixed claim of ineffective assistance." *Id.* (cleaned up). While the court noted that it was "not evident from the matter appearing on the record that [Petitioner] was deprived of the effective assistance of counsel," it explained that because the ineffective assistance claim could not be "resolved without reference to matter outside the record, a C.P.L. § 440.10 proceeding [was] the appropriate forum for reviewing the claim in its entirety" (and indeed, that claim was addressed

21

in its entirety in the appellate court's opinion issued the same day on the appeal of the County Court's two § 440.10 decisions).  *Id.*  Finally, the appellate court held that Petitioner's remaining contentions were "without merit."  *Id.* at 964.

On September 2, 2014, Petitioner was resentenced to a determinate prison term of seven years, plus five years' post-release supervision, for the crime of course of sexual conduct against a child in the second degree.  Resp. Aff. at 35.  Petitioner was immediately released upon resentencing, as he had already served more than seven years in prison.  *See id.*[10]

On November 30, 2015, the New York Court of Appeals denied Petitioner's applications for leave to appeal both the Appellate Division, Second Department's order modifying and then affirming Petitioner's judgment of conviction, and the appellate court's order affirming the County Court's orders on Petitioner's § 440.10 motion.  *See People v. Ross*, 26 N.Y.3d 1043 (2015).

\* \* \* \* \* \* \* \* \* \*

Petitioner filed the instant Petition on November 29, 2016.  ECF Nos. 1, 3.  Respondent filed opposition papers on June 1, 2017, ECF Nos. 11-13, and Petitioner filed reply submission on July 1, 2017, ECF No. 15.

## DISCUSSION

### I.    Standard of Review

"Habeas review is an extraordinary remedy."  *Bousley v. United States*, 523 U.S. 614, 621 (1998) (citing *Reed v. Farley*, 512 U.S. 339, 354 (1994)).  To be granted a writ of habeas corpus from a federal district court, a petitioner must fully and carefully comply with the

---

[10] Petitioner was on post-release supervision at the time the Petition was filed in 2016, but that term of post-release supervision has been completed.

provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Before a federal district court may review the merits of a state criminal judgment in a habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If a petitioner has met these threshold requirements, a federal district court may hear "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court must then determine the appropriate standard of review applicable to the petitioner's claims in accordance with 28 U.S.C. § 2254(d).

Generally, a state prisoner has one year from the date his or her conviction becomes final to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

Under the AEDPA, all state court remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A); *see also Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014). In the interests of comity and expeditious federal review, "[s]tates should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *see also Daye v. Attorney Gen. of the State of New York*, 696 F.2d 186, 190-91 (2d Cir. 1982).

Even where a timely and exhausted habeas claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon an "adequate and independent finding of a procedural default" to

23

deny it.  *Harris v. Reed*, 489 U.S. 255, 262 (1989); *see also Coleman*, 501 U.S. at 730; *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir. 1995).  A state court decision is "independent" when it "fairly appears" to rest primarily on state law.  *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006) (citing *Coleman*, 501 U.S. at 740).  A decision is "adequate" if it is "'firmly established and regularly followed' by the state in question."  *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

Provided a claim meets all procedural requirements, the federal court must apply the AEDPA's deferential standard of review when a state court has decided a claim on the merits. *See Torres v. Berbary*, 340 F.3d 63, 68 (2d Cir. 2003).  Under the AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent "if 'the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'"  *Torres*, 340 F.3d at 68 (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)).  "[A]n 'unreasonable application' of 'clearly established' Supreme Court precedent occurs when a state court 'identifies the correct governing legal

24

principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).  While

> it is clear that the question is whether the state court's application of clearly established federal law was objectively unreasonable, the precise method for distinguishing objectively unreasonable decisions from merely erroneous ones is less clear.  However, it is well-established in [the Second Circuit] that the objectively unreasonable standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief.

*Id.* at 68-69 (cleaned up).

Under the second prong of § 2254(d), the factual findings of state courts are presumed to be correct.  *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997).  The petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## II.      Threshold Determinations

### A.      Timeliness

The New York Court of Appeals denied Petitioner's applications for leave to appeal the denial of his direct appeal and the denial of his § 440.10 motion on November 30, 2015. Because Petitioner did not file a petition for a writ of certiorari seeking review of the New York State court decisions in the United States Supreme Court, his conviction became final on February 29, 2016, 90 days after the orders denying his applications for leave to appeal to the New York Court of Appeals.  *See McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003).  Petitioner therefore had until March 1, 2017 to file his habeas petition based on the date his direct appellate review was completed, and the Petition was filed on November 29, 2016.  Accordingly, the Petition was timely filed.  Respondent does not dispute that the Petition was timely filed.

25

### B. "In Custody" Requirement and Mootness

The Court continues to have jurisdiction over this habeas proceeding—Petitioner was "in custody" at the time that he filed the Petition, and the Petition is not moot given that Petitioner faces collateral consequences as a result of his conviction.

"A district court may not entertain a petition for a writ of habeas corpus seeking review of a state court judgment unless the petitioner satisfies the jurisdictional 'in custody' requirement of 28 U.S.C. § 2254." *Harvey v. People of the City of New York*, 435 F. Supp. 2d 175, 177 (E.D.N.Y. 2006) (citing *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir. 1994)); *see* 28 U.S.C. § 2254(a). "To do this, the petitioner must be in custody pursuant to the challenged judgment when the petition for collateral review is filed." *Harvey*, 435 F. Supp. 2d at 177. "Physical confinement is not necessary to satisfy the 'in custody' requirement; a petitioner who is on parole or serving a term of supervised release is 'in custody' for the purposes of the federal habeas corpus statutes." *Id.* While Petitioner was released from prison upon his resentencing in September 2014, he was still serving the portion of his sentence that imposed a five-year term of post-release supervision when the Petition was filed in November 2016. Accordingly, Petitioner was "in custody" for purposes of 28 U.S.C. § 2254. *Harvey*, 435 F. Supp. 2d at 177; *see Byng v. Annucci*, No. 18-cv-994 (JKS), 2021 WL 1565189, at *3 (N.D.N.Y. Apr. 21, 2021) ("[A] petitioner serving a term of supervised release is considered 'in custody' for purposes of 28 U.S.C. § 2254."); *Archbold v. Hessel*, No. 08-cv-3898 (SHS) (FM), 2011 WL 2671527, at *9 (S.D.N.Y. June 20, 2011) ("a petitioner . . . despite being on parole, remains 'in custody' within the meaning of Section 2254"), *adopted as modified*, 2011 WL 2946169 (S.D.N.Y. July 19, 2011).

Moreover, despite the fact that Petitioner's term of post-release supervision has now expired, the Petition is not moot. "In cases where the petitioner challenges the conviction itself, the Supreme Court has been willing to *presume* the existence of collateral consequences sufficient to satisfy the case-or-controversy requirement even if those collateral consequences are remote and unlikely to occur." *Byng*, 2021 WL 1565189, at *3 (quotation marks omitted) (emphasis in original). "This presumption of collateral consequences has been justified on the theory that most criminal convictions do in fact entail adverse collateral legal consequences, including deportation, enhancement of future criminal sentences, and certain civil disabilities such as being barred from holding certain offices, voting in state elections, and serving on a jury." *Id.* (quotation marks omitted); *see also King v. Coveny*, No. 18-cv-2851 (KPF) (OTW), 2022 WL 4952537, at *3 n.1 (S.D.N.Y. Oct. 3, 2022); *Cox v. Brandt*, No. 10-cv-9175, 2012 WL 2282508, at *7 n.7 (S.D.N.Y. June 15, 2012), *adopted by* No. 10-cv-9175, ECF No. 24 (S.D.N.Y. July 17, 2012). Accordingly, because Petitioner remains subject to the collateral consequences of his conviction, the Petition has not been mooted by the expiration of his term of post-release supervision.

### III.     Petitioner's Claims for Habeas Relief

Petitioner asserts that his conviction should be vacated because it was based on a violation of his Sixth Amendment right to effective assistance of counsel. Petition ¶ 12(a). Petitioner lists numerous alleged failures by Mr. Mazzamurro. *Id.* His first set of claims involves expert witnesses. *Id.* Petitioner asserts that Mr. Mazzamurro failed to examine the recordings of Dr. Canter's examinations of K.K., have experts review those recordings, or retain an expert to counter Dr. Canter's testimony. *Id.* Petitioner maintains that Mr. Mazzamurro also failed to consult with a psychological expert on CSAAS, and failed to call an expert to counter

27

the testimony of Dr. Meltzer.  *Id.*  Petitioner further contends that Mr. Mazzamurro was ineffective because failed to obtain funds for experts, or to apply for additional funds after his motion for leave to do so was granted, and failed to make an additional application for such funds after Petitioner proved unable to provide them.  *Id.*

Petitioner's second set of *Strickland* claims involves other aspects of Mr. Mazzamurro's trial strategy.  *Id.*  Petitioner claims that Mr. Mazzamurro failed to call as a trial witness K.K.'s pediatrician, who said he had never received complaints from K.K. or observed any abuse.  *Id.* Additionally, Petitioner faults Mr. Mazzamurro for failing to effectively cross-examine K.K.'s mother or present evidence about the turbulent Family Court, custody, and visitation history between Petitioner and K.K.'s mother, including the mother's prior attempts to have Petitioner investigated for child abuse.  *Id.*

### A.    Legal Standard for Ineffective Assistance of Counsel

In order to prevail on a claim of ineffective assistance of counsel, a habeas petitioner must demonstrate both (1) that counsel's performance was "deficient" in that it fell below an "objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687-88.  However, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.

With respect to the performance component of the inquiry, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  A court must bear in mind both that counsel "has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process," and that counsel must have "wide latitude" in making tactical decisions.  *Henry v.*

28

*Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 688-89).  "[C]ourts strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Englert v. Lowerre*, 115 F.4th 69, 81 (2d Cir. 2024) (cleaned up) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011)).  The petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  *Strickland*, 466 U.S. at 689 (quotation marks omitted).

With respect to the prejudice component, the petitioner must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id.* at 687.  To satisfy the prejudice prong, "[t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome"—that is, "absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 694-95.  This requires "a substantial, not just conceivable, likelihood of a different result."  *Cullen*, 563 U.S. at 189 (cleaned up) (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).

When evaluating an ineffective assistance of counsel claim in a habeas petition, a court's review is "doubly deferential" because the court is charged with taking "a highly deferential look at counsel's performance through the deferential lens of § 2254(d)."  *Cullen*, 563 U.S. at 190 (cleaned up); *see also Jackson*, 763 F.3d at 153.  "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable."  *Harrington*, 562 U.S. at 101.  "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard."  *Id.*  Federal habeas courts "must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d)

29

applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.

"Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102. Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Moreover, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied" it. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

### B.    Counsel's Failure to Consult with or Call Medical Experts

"Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" *Harrington*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." *Id.* (cleaned up). Indeed, the Supreme Court has made clear that counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 107 (collecting cases).

30

As to the first, or performance, prong of the *Strickland* analysis, Petitioner "bears a heavy burden in arguing that trial counsel was constitutionally ineffective in failing to consult with or call a medical expert" to counter the prosecution's medical expert because, "as the Supreme Court has stated, strategic decisions—*including whether to hire an expert*—are entitled to a strong presumption of reasonableness." *Englert*, 115 F.4th at 82 (quotation marks omitted) (emphasis in original). Courts "evaluate the reasonableness of an attorney's investigative choices with a heavy measure of deference to counsel's judgments, mindful that the same investigation is not required in every case and it is rare that constitutionally competent representation will require any one technique or approach." *Id.* (cleaned up). "[C]ontrolling Supreme Court precedent . . . makes clear [that] no *per se* rule dictates that expert consultation is always necessary in order to provide effective assistance of counsel in child sexual abuse cases." *Id.* at 74 (quotation marks omitted).[11] "*Strickland* does not require 'for every prosecution expert an equal and opposite expert from the defense.'" *Id.* at 83 (quoting *Harrington*, 562 U.S. at 111). Rather, as the Supreme Court observed in *Harrington*, "[i]n many instances cross-examination will be sufficient to expose defects in an expert's presentation." 562 U.S. at 111. Furthermore, consistent with the doubly deferential review required at the first step of *Strickland* analysis, "a § 2254 petitioner claiming that counsel was constitutionally ineffective in failing to consult with or call an expert witness must show that *every* fairminded jurist would agree that *every* reasonable lawyer would have consulted or called a medical witness in the particular case." *Englert*, 115 F.4th at 83 (cleaned up).

---

[11] Even the Second Circuit's decision in *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005), which Petitioner relies on in support of his arguments, *see* Pet. Mem. at 45, acknowledges that "there is no *per se* rule that requires trial attorneys to seek out an expert," even in child sexual abuse cases, 426 F.3d at 609; *see Englert*, 115 F.4th at 82 (discussing *Gersten*).

In affirming the County Court's decision denying Petitioner's 440.10 motion, the Appellate Division, Second Department concluded that "[b]ased on the totality of the circumstances, the County Court properly found that there were legitimate reasons that trial counsel did not present expert testimony and, instead, challenged the People's evidence through cross-examination." *People v. Ross*, 119 A.D.3d at 965 (citing, *inter alia*, *Hinton v. Alabama*, 571 U.S. 263 (2014), and *Harrington*).  This conclusion was neither contrary to nor an unreasonable application of *Strickland*, nor was that decision based on an unreasonable determination of the facts in light of the evidence presented in state court.  As to the factual findings underpinning the state courts' decisions that Mr. Mazzamurro was not ineffective for failing to consult with or call a medical expert, which are presumed to be correct, *Nelson*, 121 F.3d at 833, Petitioner has not presented the necessary "clear and convincing evidence" to rebut the presumption, 28 U.S.C. § 2254(e)(1).

In reaching its conclusion, the Appellate Division provided a concise synopsis of the 440.10 hearing testimony.  Regarding the events leading up to Petitioner's trial, the Appellate Division summarized Mr. Mazzamurro's testimony as follows:

> At the hearing, trial counsel testified that he requested and received public funding in the amount of $1,000 to retain experts and a private investigator.  However, this sum proved insufficient to obtain the opinions or the appearances of experts.  Trial counsel then requested that he be relieved and that assigned counsel be appointed to represent [Petitioner].  [Petitioner] objected, assuring trial counsel that the necessary funds would be available; however, [Petitioner] failed to provide the additional funds.  Consequently, trial counsel pursued a strategy that focused on denial of the accusations and impeachment of witnesses.

*Id.* at 964-65.  Mr. Mazzamurro did not act unreasonably in making this pivot in strategy. "Counsel is entitled to formulate a strategy that was reasonable at the time and to balance limited

resources in accord with effective trial tactics and strategies." *Harrington*, 562 U.S. at 107

(collecting cases).

Mr. Mazzamurro testified at the 440.10 hearing as to the affirmative steps he took in

pursuit of his defense strategy. To prepare to undermine Dr. Canter's testimony, he read Dr.

Canter's reports from her examinations, researched colposcopy examinations, and read articles

about the hymen and signs of sexual abuse in children. *See* 440.10 Hr'g Tr. at 51, 72-74, 131-37,

142, 144. Mr. Mazzamurro testified that he became familiar with various medical terms while

preparing for trial and reading Dr. Canter's examination reports, and deployed them during his

cross-examination. *See id.* at 144. Mr. Mazzamurro testified that in preparing for his cross-

examination of Dr. Meltzer, he "was trying to get as much information as possible" about

CSAAS in order to counter her testimony. *Id.* at 50, 74, 151. Mr. Mazzamurro recalled that a

child experiencing CSAAS "will testify in a certain way, and you have to understand why there's

a delay in disclosure, who they tell," and also recalled that there are five elements to the

syndrome. *Id.* at 46. Mr. Mazzamurro also believed that he had previously had printouts of

research on the topic of CSAAS in his file, as he recalled that it was "an important piece of

research." *Id.* at 51; *see also id.* at 179 (testifying he performed Internet searches on CSAAS

prior to trial and believed he performed research on colposcopy examinations, but could not

recall specifics and did not have copies of his research).

In its decision on the 440.10 motion, the Appellate Division summarized how Mr.

Mazzamurro implemented his strategy at trial, *i.e.*, through "an effective cross-examination of

the complainant, as well as of the prosecutor's medical and psychological experts," stating that

> [h]e was successful in getting the complainant to recant critical aspects of
> her testimony regarding genital contact between herself and [Petitioner], a
> necessary element of the charges of course of sexual conduct against a
> child in the first degree and incest. He also elicited from the medical

33

> expert that she could not determine whether an alleged asymmetry in the
> border of the complainant's hymen was caused by penile penetration or
> was the result of one or more acts of penetration, which was a necessary
> element of the charge of course of sexual conduct against a child in the
> first degree.  Trial counsel also elicited from the psychological expert that
> she mostly testified on behalf of the prosecution, that child allegations of
> sexual abuse are unreliable when made in response to suggestive
> questioning, and that this most often occurs, as here, against the
> background of a dispute over custody and visitation.

*People v. Ross*, 119 A.D.3d at 965.  Indeed, during the 440.10 hearing, Mr. Mazzamurro testified

that he was able to elicit some useful testimony from Dr. Canter on cross-examination, including

an admission that she could not determine what had penetrated the child, how many times the

child had been penetrated, or that Petitioner had penetrated the child.  *See* 440.10 Hr'g Tr. at

143-44.[12]  Mr. Mazzamurro also testified that his research informed his cross-examination of Dr.

Meltzer, and he was thus able to successfully elicit several admissions from Dr. Meltzer that

were favorable to Petitioner's case—that 20 percent of the cases that are brought involve false

accusations; that these cases are often driven by custody disputes; and that children are very

---

[12] Respondent contends that Petitioner's claims that Mr. Mazzamurro failed to consult with or engage a medical expert to counter Dr. Canter's testimony were rendered moot by the Appellate Division, Second Department's modifications to Petitioner's convictions.  *See* Resp. Mem. at 6-7.  According to Respondent, because the offense of course of sexual conduct against a child in the second degree does not necessarily require proof of penetration, Dr. Canter's testimony regarding penetration was not essential to support a conviction for that crime.  *See id.*; *but see* ECF No. 15 at 7-8 & n.3 (explaining how digital penetration could give rise to a conviction for this offense).  This argument is unavailing.  In concluding that the evidence at trial was legally and factually sufficient to establish Petitioner's guilt of course of sexual conduct against a child in the second degree, the appellate court specifically relied on K.K.'s testimony regarding digital penetration.  *See People v. Ross*, 119 A.D.3d at 963.  Thus even if evidence of penetration is not always required as an element of this crime, it is apparent that such evidence was directly relevant to Petitioner's conviction here, and Dr. Canter's testimony regarding penetration would therefore remain relevant as corroboration for K.K.'s testimony.  The appellate court's reduction of this count of conviction therefore does not render Petitioner's arguments regarding Dr. Canter moot.  Nevertheless, for all of the reasons set forth herein, Petitioner has failed to establish that habeas relief is appropriate for this claim.

suggestible at certain ages, and the way a person questions a child can shape the child's response. *See id.* at 219.[13]

Petitioner claims that Mr. Mazzamurro was ineffective for failing to seek additional funds for an expert based on the Supreme Court's decision in *Hinton*, but *Hinton* is inapposite. In *Hinton*, the Supreme Court based its finding of ineffectiveness on counsel's "inexcusable mistake of law," namely, counsel's "unreasonable" mistaken belief that under Alabama law, he could not seek further funds to cover expert fees. 571 U.S. at 273-74; *see id.* at 274 ("The trial attorney's failure to request additional funding in order to replace an expert he knew to be inadequate *because he mistakenly believed that he had received all he could get under Alabama law* constituted deficient performance.") (emphasis added). Here, Mr. Mazzamurro had no mistaken belief as to New York law governing applications for funds to pay expert fees. Indeed, he had successfully applied for, and been awarded, such fees. Rather, he found that the amount

---

[13] Petitioner claims that the state courts erroneously found that Mr. Mazzamurro's cross-examination of the prosecution's experts was effective, *see* Pet. Mem. at 50-54, and while Mr. Mazzamurro sought to "defend his representation" by citing his cross-examination of K.K. that resulted in overturning his conviction on the charges of course of sexual conduct against a child in the first degree and incest, Petitioner was still convicted of course of sexual conduct against a child in the second degree, based, at least in part, on Dr. Canter's unrefuted testimony that the hymenal injury was consistent with digital penetration. *See id.* at 52. As the Supreme Court stated in *Strickland*, however, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Just as the Court rejects Respondent's contention that Petitioner's claims that Mr. Mazzamurro failed to consult with or engage a medical expert to counter Dr. Canter's testimony were rendered moot by the Appellate Division, Second Department's modifications to Petitioner's convictions, *see* footnote 12, *supra*, the Court likewise rejects Petitioner's contention that Mr. Mazzamurro's failure to consult with or engage a medical expert to counter Dr. Canter's testimony necessarily constitutes ineffectiveness because he was still convicted of the lesser charge.

of funds awarded were insufficient.  Thus, when he was reinstated as Petitioner's counsel, and he discovered that Petitioner did not, in fact, have the necessary funds, as had been promised, he decided to change his trial strategy and forgo the use of experts.

Moreover, unlike *Hinton*, Petitioner here has failed to show that "the only reasonable and available defense strategy," 571 U.S. at 273 (cleaned up), was for Mr. Mazzamurro to consult with or use a medical expert at trial.  While Mr. Mazzamurro would have wanted to hire an expert, if possible, he never testified that he was *unable* to defend the case without an expert.  In addition, Mr. Warhit, the attorney who had been appointed as counsel for Petitioner by the State Court, told Mr. Mazzamurro that he did not think it was necessary to use a medical expert.  *See* 440.10 Hr'g Tr. at 149-50.  "[A] § 2254 petitioner claiming that counsel was constitutionally ineffective in failing to consult with or call an expert witness must show that *every* fairminded jurist would agree that *every* reasonable lawyer would have consulted or called a medical witness in the particular case."  *Englert*, 115 F.4th at 83 (cleaned up) (emphases in original).  Petitioner has not, and cannot, make such a showing here.

Furthermore, although Petitioner correctly notes that "the standard set out in *Strickland* constitutes 'clearly established Federal law,' within the meaning of 28 U.S.C. § 2254(d)(1)[,]" Pet. Mem. at 43, he relies on the Second Circuit decision in *Gersten*, as well as earlier Second Circuit decisions in *Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003), *Lindstadt v. Keane*, 239 F.3d 191 (2d Cir. 2001), and *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001), to support his contention that Mr. Mazzamurro was obligated to consult with or use an expert and that the failure to consult with or use an expert constituted ineffective assistance of counsel.  But in *Englert*, where the petitioner likewise relied on *Gersten*, *Eze*, *Lindstadt*, and *Pavel*, the Second Circuit explained that

36

> AEDPA permits federal habeas relief from a state conviction based on legal error only if a state court's legal rulings were contrary to or unreasonably applied federal law "as determined by the Supreme Court[.]" 28 U.S.C. § 2254(d)(1).  Thus, *Gersten* and similar earlier precedents of our court here relied on by Englert must be understood in light of *Harrington v. Richter*'s teachings as to both the *Strickland* deference properly accorded counsel's choices in deciding whether to consult or call experts and the AEDPA deference properly accorded state courts on habeas review of such a claim.

*Id.* at 83 (footnote omitted).  Not only was the Supreme Court's decision in *Harrington*, issued on January 19, 2011, "clearly established Federal law" when the County Court issued its decision on the 440.10 motion on November 30, 2011, but the Appellate Division cited *Harrington* in its decision upholding the County Court's decision.

For the reasons stated above, the Appellate Division's determination that Mr. Mazzamurro did not provide ineffective assistance—because there were "legitimate reasons" for his change in strategy, *People v. Ross*, 119 A.D.3d at 965—was not an unreasonable application of the "clearly established Federal law" governing the ineffective assistance of counsel, nor was that decision based on an unreasonable determination of the facts in light of the evidence presented in state court.[14]  Accordingly, this ground for habeas relief should be denied.

### C.    Petitioner's Remaining Ineffective Assistance Claims

Petitioner's second set of ineffective assistance claims concerns other purported missteps by Mr. Mazzamurro at trial—(1) the failure to call K.K.'s pediatrician as a trial witness, and (2) the failure to cross-examine B.K. or present evidence about the history of the Family Court proceedings.  Petition ¶ 12(a).  As to these ineffective assistance of counsel claims, the Appellate

---

[14] Because the Court has concluded that Petitioner has failed to make a sufficient showing that Mr. Mazzamurro rendered ineffective assistance under the performance prong of the *Strickland* analysis regarding this first set of ineffective assistance of counsel claims, the Court does not address the prejudice prong, because a court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one."  466 U.S. at 697.

Division affirmed the County Court's denial of these claims, stating that "contrary to [Petitioner's] remaining contentions, viewing trial counsel's performance in totality, he provided meaningful representation." *People v. Ross*, 119 A.D.3d at 965. For the reasons that follow, the state court's decision was neither contrary to nor an unreasonable application of *Strickland*.[15]

### 1. Failure to Call K.K.'s Pediatrician at Trial

Petitioner asserts that Mr. Mazzamurro was ineffective because he failed to call Dr. Schaff, K.K.'s pediatrician, who had "received no complaints of or observed any abuse," as a trial witness. Petition ¶ 12(a). Mr. Mazzamurro testified that he consulted with Dr. Schaff regarding general medical issues prior to the trial, and although Dr. Schaff was present and available to testify at trial, Dr. Schaff did not end up testifying. *See* 440.10 Hr'g Tr. at 66-68. Mr. Mazzamurro testified that he did not ultimately call Dr. Schaff to the stand because Dr. Schaff said he was "not the type of doctor that could handle this type of matter," and could not weigh in on the colposcopy issue. *Id.* at 67. Mr. Mazzamurro testified that Dr. Schaff described K.K. as "a happy, healthy child," but also "really didn't have much of an interaction with the child, and . . . speaking to the child, he really didn't notice anything." *Id.* at 68.

"[A]ctions or omissions that 'might be considered sound trial strategy' do not constitute ineffective assistance." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999) (quoting *Strickland*, 466 U.S. at 689). The decision whether to call any witnesses on behalf of the defendant "falls squarely within the ambit of trial strategy," *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987), and thus the "failure to call a witness for tactical reasons of trial

---

[15] As to this set of ineffective assistance of counsel claims, Petitioner has not challenged the state court factual findings underpinning its decision rejecting these claims, which are presumed to be correct, *see* Pet. Mem. at 55-56; *see also Nelson*, 121 F.3d at 833; 28 U.S.C. § 2254(e)(1), and there is no basis to conclude that the Appellate Division's decision was based on an unreasonable determination of the facts in light of the evidence presented in state court.

strategy does not satisfy the standard for ineffective assistance of counsel," *United States v. Eyman*, 313 F.3d 741, 743 (2d Cir. 2002) (*per curiam*); *Miller v. Superintendent of Shawangunk Corr. Facility*, No. 18-cv-1762 (RA), 2020 WL 4432096, at *13 (S.D.N.Y. July 31, 2020), *aff'd*, 2022 WL 1669195 (2d Cir. May 26, 2022) (summary order). "Absent a failure of preparation or abdication of the duty of representation, decisions to call or not to call witnesses remain within the discretion of defense counsel." *Lopez v. Greiner*, 323 F. Supp. 2d 456, 480 (S.D.N.Y. 2004), *aff'd*, 159 F. App'x 320 (2d Cir. 2005) (summary order).

Here, Petitioner cites Mr. Mazzamurro's affidavit submitted in support of the 330.30 motion, where Mr. Mazzamurro stated that he "should have called [Dr. Schaff] to testify as to his medical observations of [K.K.] over the years, as well as to whether she complained of abuse or not." Resp. Ex. 3 (ECF No. 13-6) at ECF p. 12. Although Mr. Mazzamurro explained that he decided not to call Dr. Schaff because "the People did not put on a prompt outcry witness, nor allege that [K.K.] confided in someone immediately, . . . [and he] did not want to prove something that the People conceded did not occur[,]" Mr. Mazzamurro observed that "in the absence of other defense expert testimony, Dr. Schaff could have provided some buttressing to [Mr. Mazzamurro's] argument that these allegations were false." *Id.* at ECF pp. 12-13; *see* Pet. Mem. at 55. But "[i]n assessing the attorney's performance, a reviewing court must judge his [or her] conduct on the basis of the facts of the particular case, viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his [or her] strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (cleaned up). It is therefore immaterial whether Mr. Mazzamurro, employing hindsight, believed that he should have made a different strategic decision. Rather, Mr. Mazzamurro's decision not to call Dr. Schaff at trial fell "within the ambit of trial strategy." *Nersesian*, 824 F.2d at 1321. As he testified at the 440.10 hearing, Mr.

Mazzamurro's impression was that Dr. Schaff did not have much interaction with K.K., and he also recognized that Dr. Schaff would not be able to contribute any medical findings or observations to combat Dr. Canter's testimony regarding the colposcopy.  This was not a situation where Mr. Mazzamurro failed to prepare or abdicated his duty of representation—he made the decision not to put Dr. Schaff on the stand in his discretion, as part of his trial strategy, after communicating with Dr. Schaff and preparing him to testify.  The Appellate Division's determination that this did not constitute ineffective assistance of counsel was neither contrary to, nor an unreasonable application of, *Strickland*.

**2.       Failure to Cross-Examine B.K. or Present Evidence About Family Court History**

Petitioner additionally claims that Mr. Mazzamurro "failed to cross examine effectively or present evidence as to a [F]amily [C]ourt and custody and visitation history that included the mother's prior attempts to have the petitioner investigated for abuse (which were determined to be unfounded)."  Petition ¶ 12(a).  It is true that Mr. Mazzamurro did not present evidence of the turbulent custody history and visitation disputes between Petitioner and B.K., or use B.K.'s history of complaints in Family Court to undermine her credibility during cross-examination. *See* Resp. Ex. 3 (ECF No. 13-6) at ECF pp. 9-10.

"Decisions about whether to engage in cross-examination, and if so to what extent and in what manner, are strategic in nature and generally will not support an ineffective assistance claim."  *Waiters v. Lee*, No. 20-2190, 2021 WL 5183539, at *3 (2d Cir. Nov. 9, 2021) (quotation marks omitted).  "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."  *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998).  Indeed, the Second Circuit has "declined to deem

40

counsel ineffective notwithstanding a course of action (or inaction) that seems risky, unorthodox, or downright ill-advised." *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996) (citing cases).  In this case, a more in-depth exploration of the bitter custody battle between K.K.'s parents could have been advantageous to Petitioner if Mr. Mazzamurro was able to show through his cross-examination that B.K. had a motive to prompt the fabrication of abuse claims against Petitioner. On the other hand, this method could also have backfired—the Putnam County Family Court ultimately found that Petitioner had sexually abused K.K., *see* Resp. Aff. at 6-7, and questioning B.K. about her conduct in Family Court proceedings could have opened the door to damaging testimony about Petitioner.  Given that the extent of cross-examination was within Mr. Mazzamurro's discretion, and strategic justification existed for his choice not to explore the custody and visitation history, the Appellate Division's determination that this strategy did not constitute ineffective assistance of counsel also was neither contrary to, nor an unreasonable application of, *Strickland*.

* * * * * * * * * *

Accordingly, this ground for habeas relief also should be denied.[16]

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Petition be DENIED in its entirety.

---

[16] As with Petitioner's first set of ineffective assistance of counsel claims, because the Court has concluded that Petitioner has failed to make a sufficient showing that Mr. Mazzamurro rendered ineffective assistance under the performance prong of the *Strickland* analysis regarding this set of claims, the Court does not address the prejudice prong, because a court need not "address both components of the inquiry if the [petitioner] makes an insufficient showing on one."  466 U.S. at 697.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have 14 days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any responses to such objections, must be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Philip M. Halpern, United District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the Honorable Andrew E. Krause at the same address. Any request for an extension of time for filing objections or responses to objections must be directed to Judge Halpern, and not to the undersigned.

**Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015).

Dated: December 22, 2025
      White Plains, New York

Respectfully submitted,

_____
ANDREW E. KRAUSE
United States Magistrate Judge